UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO. CR-11-0081-E-EJL |
| Plaintiff, | ) | |
| | ) | MEMORANDUM ORDER |
| vs. | ) | |
| | ) | |
| OLIVER VAZQUEZ-SILVA, | ) | |
| | ) | |
| Defendant. | ) | |

Pending before the Court in this matter is Defendant's Motion to Suppress all evidence obtained as a consequence of a traffic stop, arrest, search of the vehicle, and/or any statements made by the Defendant following his arrest. The Government opposes the Motion. On October 18, 2011, the Court held a hearing on the Motion and took the matter under advisement. This Order contains the Court's findings and ruling on the Motion.

**Factual Background**

In early 2011, law enforcement agencies in Idaho and Utah were investigating Jose Rangel-Cortes, Ivette Coria, and Delpina Tonnelli. The investigation included multiple controlled purchases of methamphetamine between these individuals and a confidential informant. These initial purchases were for smaller amounts of around a half an ounce to an ounce each. As a result of this investigation, law enforcement had obtained arrest warrants for Mr. Rangel and Ms. Coria as well as a search warrant for Mr. Rangel's residence in Logan, Utah and his GMC pickup truck.

On February 25, 2011, Idaho State Police Detective Jason Horst arranged another controlled buy of a larger quantity, a quarter pound, of methamphetamine from Mr. Rangel using the confidential informant. Mr. Rangel was expected to drive north of his residence to a 7-11 in Smithfield, Utah to complete the transaction. On that morning, Detective Horst was in contact with the confidential informant who was in turn in contact with Mr. Rangel and Ms. Coria.

At the same time, Logan City Police Department Officer Anthony C. Williams and Sergeant Justin Peterson had Mr. Rangel's residence under surveillance when a red Volkswagen Jetta arrived at the home. The Jetta was driven by Oliver Vazquez-Silva whom the officers did not know of at the time from their previous investigation. Officer Williams observed Mr. Vazquez access the trunk of the Jetta twice and then enter the residence. Officer Williams described Mr. Vazquez's behavior when accessing the trunk as "suspicious"; in that he was looking to the side and behind while he was accessing the trunk.

Detective Horst contacted Officer Williams and notified him that the buy had been arranged and we "should see some movement from the house." Approximately two minutes later, Mr. Rangel and Mr. Vazquez left the residence together in Mr. Rangel's pickup truck, with Mr. Rangel driving, and Mr. Vazquez as the passenger.[1] The pickup truck traveled north on Highway 91 towards Smithfield, Utah.

---

[1] Mr. Rangel and Mr. Vazquez had left previously that morning to go to a dollar store and then returned to the residence. When they left on that occasion, Officer Williams had not yet been notified by Detective Horst that the buy was about to take place.

As they had previously planned, the Logan City Officers initiated a traffic stop of the pickup in North Logan, Utah. The two Officers approached either side of the vehicle, directed the occupants to exit the vehicle, and both were placed in handcuffs for officer safety. Officer Williams asked Mr. Vazquez if he had identification to which he stated he did not. While at the side of the road, Mr. Vazquez responded to Officer Williams questions giving his name, date of birth, and that he resided with his brother somewhere in Preston, Idaho but could not remember the address. Mr. Vazquez also told Officer Williams he was traveling with Mr. Rangel who was going to help him find a job.

Mr. Rangel was placed under arrest pursuant to the warrant and Mr. Vazquez was detained for further investigation upon suspicion of distribution of narcotics. A canine unit was deployed at the scene of the traffic stop and its handler told Officer Williams the canine had alerted for the presence of drugs in the pickup. The officers searched the pickup for drugs but none were found at that time.

Mr. Vazquez and Mr. Rangel were transported to the Logan City Police Department's interview rooms by other officers while Officer Williams regrouped with other law enforcement and returned to Mr. Rangel's residence. The home was then secured by the officers conducting a protective sweep. A canine unit was used during the protective sweep to secure the house. The canine also, as per standard procedure, did an open air sniff around the vehicles located near the residence including the Jetta. During the open air sniff, the canine alerted on the Jetta but the officers did not search the vehicle at that time. Once

secured, the officers then executed the search warrant for Mr. Rangel's home that they had previously obtained.[2]

While the search of the residence was concluding, Officer Williams returned to the Logan City Police Department where he asked Mr. Vazquez for consent to search the Jetta. At the same time, other officers were attempting to obtain a search warrant for the Jetta. Prior to interviewing Mr. Vazquez, Detective Cody Olsen, who is fluent in Spanish, orally advised Mr. Vazquez of his *Miranda* rights. Mr. Vazquez invoked his right to counsel but later asked to speak with the officers at which time they provided him with a *Miranda* warning written in Spanish. Mr. Vazquez then again invoked his right to counsel.

Officers eventually obtained a search warrant for the Jetta from a district judge in Utah and searched the vehicle discovering a large amount of methamphetamine. Law enforcement also eventually located four ounces of methamphetamine in the pickup truck. Mr. Vazquez has been charged, along with three other co-defendants, with conspiracy to distribute a controlled substance and related drug charges. (Dkt. 43.) Mr. Vazquez has filed the instant Motion to Suppress seeking to preclude the admission of the evidence and any statements he made on February 25, 2011.

---

[2] Officer Williams testified that the law enforcement involved on this day had previously arranged a plan where the vehicle would be stopped north of Logan and then the officers would immediately go from the traffic stop back to Mr. Rangel's residence to execute the search warrant.

## DISCUSSION

Mr. Vazquez argues he was arrested at the time of the stop without probable cause in violation of the Fourth Amendment. (Dkt. 56 at 7.) In particular, Mr. Vazquez points out that at the time of the stop he was not previously known to law enforcement or identified during the investigation, there were no outstanding warrants for his arrest, and there was nothing discovered during the stop or search of the pickup upon which to base probable cause to arrest him. The Government argues the officers had probable cause to arrest Mr. Vazquez and, regardless, the search of the Jetta was "sufficiently attenuated" to his arrest such that the evidence recovered from the Jetta is admissible. (Dkt. 61 at 3.)

**1.    Whether the Officers had Probable Cause to Arrest Oliver Vazquez-Silva**

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. CONST. AMEND. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347 (1967). The Fourth Amendment protects "people not places." *Id.* Evidence obtained in violation of the Fourth Amendment and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

In order to be reasonable under the Fourth Amendment, a warrantless arrest must be supported by probable cause. *Krainski v. Nev. ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 969 (9th Cir. 2010). "Probable cause to arrest exists when officers have

knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citation omitted). In determining whether probable cause existed, the Court applies an objective standard. *Devenpeck v. Alford*, 543 U.S. 146, 153-55 (2004). The arresting officer's subjective intention is immaterial in judging whether their actions were reasonable for Fourth Amendment purposes. *Id.*

The probable cause standard is a "practical, non-technical conception." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). A probable cause determination is two-fold. First, a court must determine "historical facts," that is, the events leading up to the stop or search. *Ornelas v. United States*, 517 U.S. 690, 696 (1996). Second, the court must determine "whether those historical facts, viewed from the standpoint of a reasonable police officer," amount to probable cause. *Id.*

Facts supporting probable cause can come from several sources, including the observations of law enforcement who use their expertise and training to draw inferences of criminal activity from behavior that is not criminal on its face. *See, e.g., Alford v. Haler*, 446 F.3d 935, 937 (9th Cir. 2006) (probable cause to arrest for impersonating officer where police observed police radio, scanner, and handcuffs in car). "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a

crime." *Lacey v. Maricopa County*, 649 F.3d 1118, 1131 (9th Cir. 2011) (citation omitted); *see also Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir. 2004).

Here, Mr. Vazquez argues the officers were limited to a *Terry* stop and frisk and, having found no evidence of a crime, were required to release him.[3] (Dkt. 56 at 7.) At the hearing, the defense challenged the basis for probable cause as "tenuous," arguing law enforcement never saw Mr. Vazquez deliver anything to Mr. Rangel and found no drugs in the pickup at the time of the arrest. At that point, the defense argues, there was no basis to arrest Mr. Vazquez because aside from the fact that Mr. Vazquez happened to be traveling with Mr. Rangel, there is no connection between Mr. Vazquez and any dealing in drugs. The Court finds otherwise.

At the time of the arrest, the officers knew of six prior controlled buys with Mr. Rangel involving smaller ounce quantities which, the officers testified, Mr. Rangel seemed to always have on hand. The officers stated they were attempting to flush out the source of the drugs. Based on their training and experience, the officers testified one way to locate the source was to purchase a larger amount of drugs. In such buys, the officers testified, the

---

[3] A *Terry* stop is a brief investigative detention the constitutionality of which is judged under the framework established in *Terry v. Ohio*, requiring that the scope of an investigative detention "must be carefully tailored to its underlying justification ..., and [may] last no longer than is necessary to effectuate the purpose of the stop." 392 U.S. 1, 19 (1968). Questions prolonging these detentions must be "reasonably related in scope to the justification of [the] initiation," unless additional suspicious factors supported by reasonable suspicion justify a broadening of that scope. *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007). "Reasonable suspicion" requires a minimal level of objective justification, more than an inchoate or unparticularized suspicion or "hunch," but less than probable cause. *United States v. Sokolow*, 490 U.S. 1, 7, (1989). In assessing the existence of reasonable suspicion, courts consider the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

supplier would frequently, at least initially, stay close to the product in order to assure payment. This tactic was put into action here. The February 25, 2011 controlled buy was purposely for a larger quantity of methamphetamine an attempt to identify out the source of the drugs or the next higher person in the chain of supply.

Law enforcement's plan for February 25, 2011 was for Detective Horst to communicate with the confidential informant to organize the drug buy and for Officer Williams to keep Mr. Rangel under surveillance at his home. Once the buy was set, Officer Williams would follow Mr. Rangel away from his home toward the drug deal and arrest him on the warrant. The officers would then immediately return to the residence, secure it, and then execute the search warrant on Mr. Rangel's home.

It was with this predetermined plan in place that Officer Williams observed Mr. Vazquez arrived at Mr. Rangel's residence in the red Jetta on the morning of February 25, 2011. The officers described Mr. Vazquez's body language in accessing the trunk as suspicious because he looked around and over his shoulder before opening the trunk. While the officers did not actually see what, if anything, was taken from the trunk, the officer testified that a quarter pound of methamphetamine is about the size of a fist and could easily be hidden. After Mr. Vazquez arrived, accessed his trunk, and entered the residence, the surveilling officers received a call from Detective Horst indicating the informant had advised him that the deal was about to take place. Both Mr. Vazquez and Mr. Rangel were then seen leaving the home and driving together in the direction of the planned location for the

controlled buy. The officers initiated the stop of the pickup truck and both occupants were handcuffed and placed in the patrol cars.

In looking at these facts known to the officers, the events surrounding the plan put into place that day, and the officers' observations of Mr. Vazquez on February 25, 2011, the Court finds that a reasonable police officer would have probable cause to initially detain and then arrest Mr. Vazquez.

The defense argues the observation of Mr. Vazquez entering his trunk is not sufficient for probable cause. On cross-examination, the defense pointed out that Officer Williams had also observed Ms. Tonnelli arrive at Mr. Rangel's home that morning carrying a couple of plastic shopping bags into the residence. The defense questioned Officer Williams as to whether it was more likely or even possible that it was Ms. Tonnelli who brought the drugs to Mr. Rangel's residence; not Mr. Vazquez whom was not observed to have carried anything into the home. Officer Williams testified he did not suspect Ms. Tonnelli because she was only in the residence a short time and she had not arrived early at any of the previous controlled purchases to deliver the drugs; although he did concede that she was present at one of the prior transactions. Officer Williams maintained that in his experience when a larger drug quantity is ordered generally the supplier will bring the drugs in person. It did not appear to Officer Williams that Ms. Tonnelli was that person particularly given the fact that during the first controlled buy it appeared Mr. Rangel was her supplier. Further, Officer Williams testified the bags Ms. Tonnelli carried were shopping bags and the manner in which

she openly carried them did not, in his training and experience, suggest she was carrying drugs. The Court finds Officer Williams' testimony to be credible and his explanation reasonable regarding Ms. Tonnelli's arrival at the home. The mere fact that Ms. Tonnelli arrived carrying bags is not enough to nullify the facts and circumstances giving rise to probable cause to arrest Mr. Vazquez.

The defense also asserts the facts here are similar to *United States v. Vaughan*, 718 F.2d 332 (9th Cir. 1983) where officers pulled over a vehicle to issue two arrest warrants and encountered a third unknown passenger in the vehicle. The officers thwarted the passenger's attempts to leave the scene; ultimately handcuffing the passenger and searching his briefcase. The Ninth Circuit held the officers had a right to briefly detain the passenger and engage in a limited *Terry* stop and frisk but that the officers exceeded the bounds of that brief detention by unlawfully searched the passenger's briefcase and the officers lacked probable cause to arrest the passenger. *Id.* at 335. The Court finds the *Vaughan* case is distinct from the facts here.

In *Vaughan*, when the officers pulled over the vehicle to issue the arrest warrants they did not know the identity of the third passenger, did not have an arrest warrant for him, and were not aware of any involvement by him in the conspiracy. In this case, the totality of the circumstances and facts known to the officers leading up to Mr. Vazquez's arrest involved more than just that he was merely a passenger in the vehicle with Mr. Rangel. Mr. Vazquez was seen arriving at Mr. Rangel's home, suspiciously accessing his trunk twice, and then

leaving with Mr. Rangel heading in the direction of the planned controlled buy just after the confidential informant had notified law enforcement that the deal was set. These facts known to law enforcement are sufficient for probable cause and vastly different from the circumstances in *Vaughan* where the officers had nothing upon which to connect the third passenger to the two suspects they were arresting on warrants.

The defense also argues that the distinction between the officers' reports as to whether Mr. Vazquez was detained or arrested is critical. The defense contends the officers' behaviors at the time of the traffic stop suggest they had not yet determined whether or not he had any involvement in the drug transaction yet and were trying to figure out if there was any evidence they could use, even from the house, to link him to the case. The point being that at the time of his arrest there wasn't sufficient probable cause for him to have been arrested, asked incriminating questions, and his property, including the Jetta, searched. The Court finds otherwise.

As stated above, the totality of the facts and circumstances known to the officers at the time of the arrest are sufficient to find probable cause existed to arrest Mr. Vazquez. The fact that Detective Horst, who was not at the scene of the traffic stop, may have said Mr. Vazquez was "detained" while Officer Williams stated Mr. Vazquez was under "arrest"does not infer otherwise. Officer Williams' testimony at the hearing, which the Court finds to be credible, was unequivocal in stating based on the totality of the circumstances there was no doubt Mr. Vazquez was involved in the drug dealings the officers had been investigating. As

stated above, this Court finds the officers had probable cause to arrest Mr. Vazquez.

**2.     Whether the Officers' Failed to Give Required *Miranda* Warnings**

In the Motion, Mr. Vazquez also asserts he was questioned without having been informed of his *Miranda* rights in written Spanish.[4] (Dkt. 56 at 5.) The purpose of the traffic stop, the defense also argues, was to execute the arrest warrant on Mr. Rangel. During the course of that arrest, the officers also arrested Mr. Vazquez, without probable cause, and questioned him without reading him his *Miranda* rights. The defense goes on to argue law enforcement unlawfully used the information obtained from the unlawful questioning to start the investigation into Mr. Vazquez's involvement into this case.

"*Miranda* warnings are only required when a suspect is both in custody and subjected to interrogation." *United States v. Esquerra-Nunez*, 215 F.3d 1334 (9th Cir. 2000) (citing *Miranda v. Arizona*, 384 U.S. 436, 477-78 (1966)). "A person is in custody where 'there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Norris*, 428 F.3d 907, 912 (9th Cir. 2005) (quoting *United States v. Crawford*, 372 F.3d 1048, 1059 (9th Cir. 2004) (en banc) (citations omitted and internal quotation marks omitted). Here, Mr. Vazquez was clearly in custody at the time of the traffic stop as he was immediately placed in handcuffs at the beginning of the stop for officer safety. Thus, whether *Miranda* warnings were required in this case depends on whether the officers were interrogating Mr. Vazquez.

---

[4] Mr. Vazquez does not speak English.

**MEMORANDUM ORDER  - PAGE 12**
(S:\Orders\Orders11\Vazquez-Silva_Suppress.frm)

Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or deprived of his freedom. *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001)."For police statements to be considered 'interrogation,' they 'must reflect a measure of compulsion above and beyond that inherent in custody itself.'" *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)). "Voluntary statements are not considered the product of interrogation. The term 'interrogation' means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.'" *Id.* "The test is an objective one; the subjective intent of the police is relevant, but not conclusive." *Id.* (citing *United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981)).

The only statements obtained from Mr. Vazquez prior to his being Mirandized involved his identification, address, and purpose of travel. Nothing else was asked or used in the investigation prior to the *Miranda* warnings. Such questions are appropriate and do not implicate *Miranda*. *See United States v. Arellano-Ochoa*, 461 F.3d 1142, 1146 (9th Cir. 2006) (Questions regarding where and when a suspect was born "are normal questions attendant to arrest and custody, so *Miranda* is not implicated.... And "nothing in our case law prohibits officers from asking for, or even demanding, a suspect's identification."). The Court finds the officers' pre-*Miranda* questioning at the time of the traffic stop was not a custodial interrogation because the questions relating to Mr. Vazquez's identity and place of residence

were not likely to elicit an incriminating response. *See Booth*, 669 F.2d at 1238 ("the ultimate test for whether questioning constitutes interrogation is whether, in light of all the circumstances, the police should have known that a question was reasonably likely to elicit an incriminating response."). "[R]outine gathering of background biographical information, such as identity, age, and address, usually does not constitute interrogation." *Washington*, 462 F.3d at 1132 (citation omitted). Beyond being asked for his identification, address, and purpose of travel at the time of the arrest, Mr. Vazquez was not questioned further about his involvement in this case until he was given his *Miranda* warnings.[5] As such, the Court finds no constitutional violation occurred here based on *Miranda's* requirements.

## 3. Whether the Search of the Jetta Was Attenuated

Alternatively, the Government argued that even if the officers violated Mr. Vazquez's constitutional rights, the search of the Jetta was sufficiently attenuated such that any evidence found therein should not be suppressed. The Government points out that law enforcement's predetermined plan for that day was to arrest Mr. Rangel just north of Logan and then immediately return to the residence to execute the search warrant, which was to include the open-air canine sniff of all vehicles near that location. This plan was in place prior to Mr. Vazquez's arrival at the residence and was to be executed regardless of Mr. Vazquez's

---

[5] Officer Williams did testify that when he later asked for consent to search the Jetta, they gave Mr. Vazquez his *Miranda* rights orally in Spanish but not in writing. Mr. Vazquez declined to give any consent. Regardless, the Government represents the application for the Jetta search warrant was made based on the open air canine sniff at the residence, not any statements obtained from Mr. Vazquez.

presence.

"'Under the Fourth Amendment ... evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, ... unless subsequent events have purged the taint.'" *United States v. Washington*, 387 F.3d 1060, 1072 (9th Cir. 2004) (citations omitted). Thus, "[u]nder established law, evidence obtained through the exploitation of illegal behavior by the police cannot be admitted into evidence.... [O]nce an illegality has been shown, we must decide whether the evidence has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (quoting *United States v. Crawford*, 372 F.3d 1048, 1092 (9th Cir. 2004) (en banc) (W.Fletcher, J., dissenting) (citation omitted).

"The test for determining whether the primary taint of a prior constitutional violation has been purged is commonly referred to as an 'attenuation analysis' or an 'attenuation test.'" *Washington*, 387 F.3d at 1073. The attenuation test considers three factors: (1) the "temporal proximity between illegality and consent;" (2) "the presence of intervening circumstances;" and (3) "the purpose and flagrancy of the official misconduct." *Id.* (citing *Chavez-Valenzuela*, 268 F.3d 719, 727–28 (9th Cir. 2001)). This "analysis advances the exclusionary rule's twin aims of deterrence and judicial integrity." *Id.* (citations and quotations omitted). Where the evidence is tainted by the illegal police behavior, all of the evidence obtained as a direct causal result of it must be suppressed. *Id.* (citations omitted).

The defense argues the unlawful arrest and un-Mirandized interrogation which lead to the search warrant for the Jetta being obtained was one in the same and the evidence must be suppressed. Had Mr. Vazquez not been detained at the scene, the defense contends he would have been able to return to the residence and leave in the Jetta but was prevented from doing so by the officers' unconstitutional arrest. Thus, the defense asserts, the officers' illegal arrest was an effort to prevent Mr. Vazquez from returning to the Jetta so that they could search it in the hope of finding evidence of his involvement in the drug sales. Therefore, the evidence in the Jetta was not sufficiently attenuated so as to have purged the taint of the officers' prior illegal arrest and questioning. The Government countered that the three attenuation factors favor the officers and the evidence here should not be suppressed.

Having reviewed the parties' briefing, evidence, and arguments, the Court agrees with the Government. As to the temporal element, immediately after the vehicle stop of the pickup truck was concluded, the officers returned to Mr. Rangel's home and conducted a security sweep before executing the search warrant on Mr. Rangel's residence. A separate search warrant was obtained for the Jetta. During the search, the officers discovered drugs in the Jetta. Although the search of the home occurred immediately after Mr. Vazquez's arrest, the search of the Jetta did not occur until after the search of the home was concluding and the officers' had returned to the police department, unsuccessfully requested Mr. Vazquez's consent, and ultimately obtained a search warrant to search the Jetta. Though it is unclear

how much time passed, at least some time had gone by since the arrest and before the Jetta was searched.

As to the second element, intervening circumstances, the Court looks "not at the defendant's conduct, but rather at 'intervening event[s] of significance' that 'render inapplicable the deterrence and judicial integrity purposes that justify excluding' tainted evidence." *Washington*, 387 F.3d at 1073 (citations omitted). "Intervening circumstances that militate in favor of attenuation must be sufficiently important to ensure that potentially tainted evidence was come at by way of some process other than the exploitation of an illegal search. *Id.* at 1073-74 (citations and quotations omitted). The search of the home, including open air canine sniff, was going to happen regardless of the arrest which is a sufficient intervening circumstance; there was no cause and effect between Mr. Vazquez's arrest and the Jetta search. Thus, the outdoor canine sniff of the Jetta had no relationship to the vehicle stop and arrest of Mr. Vazquez. During the hearing, the Government represented that the only basis for the Jetta search warrant was the canine's open air alert on the Jetta. Because this alert was the independent basis for securing the search warrant for the Jetta, it is an intervening event of significance weighing in favor of attenuation. The Court finds that the canine sniff of the Jetta, issuance of a search warrant for the Jetta, and the discovery of the methamphetamine found therein were independent and removed from Mr. Vazquez's arrest.

As to the final factor, "courts favor suppression if law enforcement officials conducted the illegal search with the purpose of extracting evidence against the defendant or if they flagrantly broke the law in conducting the search." *Washington*, 387 F.3d at 1076. That is not the case here. The officers in this case did not act purposefully or flagrantly in an effort to conduct an illegal search of the Jetta. As stated above, the search of the home, including the sniff of the vehicles, was part of law enforcement's predetermined plan. There was no relationship between the search of the Jetta and the arrest of Mr. Vazquez. The Court finds the officers acted in good faith and any mistake they may have made was not flagrant.

As to the defense theory that because the officers wanted to wanted to search the Jetta they unlawfully arrested Mr. Vazquez to prevent him from driving away in the Jetta, the Court finds otherwise. As noted above, the officers had probable cause to arrest Mr. Vazquez based on the totality of the circumstances. Furthermore, Mr. Vazquez could not have lawfully driven away in the Jetta as he did not possess a valid driver's license. It was not reasonable to believe that Mr. Vazquez would have been allowed to drive off in the Jetta without further investigation.

Accordingly, the Court finds even if the arrest of Mr. Vazquez were found to be unlawful, the later search of the Jetta was sufficiently attenuated such that the evidence found therein should not be suppressed. The Motion to Suppress is denied.

# ORDER

NOW THEREFORE IT IS HEREBY ORDERED that the Defendant's Motion to Suppress (Dkt. 56) is **DENIED**.

IT IS FURTHER ORDERED that the trial in this matter is set for **Tuesday, December 13, 2011** at 9:30 a.m. in Pocatello, Idaho.

DATED: **November 4, 2011**

_____
~~Honora~~ble Edward J. Lodge
U. S. District Judge